**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**DANIELLE LELAND,**

     **Plaintiff,**

**vs.**                          **Case No.  1:13cv71-CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

     **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by Senior United States

District Judge Maurice M. Paul.  Doc. 15.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).

After careful consideration of the entire record, the Court affirms the decision of the

Commissioner.

## I.  Procedural History

On May 19, 2008, Plaintiff, Danielle Leland, filed a Title XVI application for

Supplemental Security Income (SSI), alleging disability beginning on July 2, 2007.

R. 23, 44, 188.  (Citations to the record shall be by the symbol "R." followed by a page

number that appears in the lower right corner.)

Plaintiff's SSI application was denied on April 17, 2009, and upon reconsideration on December 9, 2009.  R. 28, 59-60.  On January 28, 2010, Plaintiff requested a hearing.  R. 23, 67.

On May 11, 2011, Plaintiff appeared and testified at a hearing conducted in Jacksonville, Florida, by Administrative Law Judge (ALJ) William H. Greer.  R. 23, 38-58.  Melissa T. Brooks, the vocational expert, testified.  R. 55-57, 145-46 (Resume).  Plaintiff was represented by N. Albert Bacharach, Jr., and Pamela C. Dunmore, attorneys.  R. 23, 117-18.

At the beginning of the hearing, Ms. Dunmore advised the ALJ that she had reviewed the file and had no objections to the admission of Exhibits 1A through 14F.  R. 40.  It appears that counsel advised the ALJ, off the record, that there were some outstanding records from Meridian Behavioral.  The ALJ stated that he would "leave the record open for 20 days, and if [counsel] need[ed] any additional time," to "let us know."  *Id*.  At the end of the hearing and after Plaintiff's testimony and the testimony of Ms. Brooks, the ALJ announced that "[t]he hearing is closed at this time."  R. 57.

The record indicates that on July 19, 2011, Plaintiff's counsel faxed Plaintiff's additional medical records to "Jax" under two separate fax transmissions.  R. 400, 417.  (The Commissioner represents in her memorandum that these exhibits were faxed to the "hearing office."  Doc. 24 at 7-8.  Plaintiff represents in her memorandum that these exhibits were faxed, but does not state where.  Doc. 23 at 2, 25.)

In any event, these records appear in the record at pages 400 through 476, Exhibits 15F and 16F.  R. 400-76.  Pages 401 through 416 are from Putnam Behavioral Healthcare (Putnam Behavioral) dated May 12, 2010, to November 30, 2010.  R. 401-

16. Pages 418 to 477 are from the Putnam County Health Department (PCHD) dated May 7, 2009, to January 10, 2011. R. 418-77. The ALJ does not refer to these exhibits in his decision. R. 23-33.

On August 18, 2011, the ALJ issued a decision and denied Plaintiff's application for SSI benefits concluding that Plaintiff was not disabled. R. 23-33. On February 14, 2013, the Appeals Council denied Plaintiff's request for review. R. 1-5. The Appeals Council stated that it had considered the evidence listed on its exhibit list, including additional records in Exhibits 15F and 16F, and "found that this information does not provide a basis for changing the [ALJs] decision." R. 1-5. The ALJ's decision stands as the final decision of the Commissioner.

On April 12, 2013, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. The parties filed memoranda of law, docs. 23 and 24, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not engaged in substantial gainful activity since May 19, 2008, the application date." R. 25.

2. "The claimant has the following severe impairments: scoliosis of the thoracolumbar spine, anxiety, bipolar disorder, posttraumatic stress disorder [PTSD], and depression." R. 25.

3. "The claimant does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 25. The ALJ considered the four broad functional "paragraph B" criteria in Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders) and ultimately determined that Plaintiff had *mild* restriction in activities of daily living; *moderate* difficulties in social functioning; *moderate* difficulties in concentration, persistence or pace; and *no* episodes of decompensation which have been of extended duration. R. 26.

4. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 416.967(b), except the claimant is able to sit up to eight hours per day and stand and walk for a total of four hours per day with no more than one hour at a time. The claimant may occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. The claimant may occasionally bend, stoop, crouch and kneel. The claimant may do occasional reaching above shoulder level. The claimant should not climb ladders, ropes, or stairs. The claimant should do no work around unprotected heights, no work around moving or hazardous machinery, or driving motorized vehicles. The claimant should have no use of foot controls. The work that the claimant would be limited [and] needs to be simple, unskilled, and repetitive. The work would need to be low to moderate stress, done primarily alone, with no large crowds and no substantial interaction with other people. R. 27.

5. "The claimant has no past relevant work." R. 31; *see* R. 28, 45-47 (limited prior attempts at work in 2008).

6. "The claimant was born on April 4, 1986, and was 22 years old, which is defined as a younger individual age 18-49, on the application was filed." *Id.* (Plaintiff was 25 years old as of the hearing date. R. 44.)

7. "The claimant has a limited education and is able to communicate in English." *Id.* (Plaintiff finished the 10th grade. She attended special education classes. R. 28, 45.)

8. "Considering the claimant's age, education, work experience and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* The claimant can perform the following jobs: office helper with an SVP of 2, unskilled, light exertional level; addresser with an SVP of 2, unskilled, sedentary exertional level; and document preparer scanner with an SVP of 2, unskilled, sedentary exertional level. R. 32.

9. "The claimant has not been under a disability as defined in the Social Security Act, since May 19, 2008, the date the application was filed." *Id.*

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[1]

 "In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

 A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

---

 [1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g). If the

Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A.  The Evidence

### 1.  Physical Impairments

In November 2007, Plaintiff reported chronic low back pain to her primary care physician at the Family Medical and Dental Centers.  R. 29, 252.  Her physician ordered x-rays that revealed scoliosis and Plaintiff was prescribed Flexeril, a muscle relaxant, and pain medication.  R. 259, 271.  He also prescribed Prozac for depressive symptoms.  R. 259.  In January of 2008, Plaintiff reported feeling better during a follow-up URI.  R. 248.  In February of 2008, Plaintiff reported increased depression and that she was separated from her husband.  R. 246.

In January 2009, at the state agency's request, Eftim Adhami, M.D., performed a physical consultative examination.  R. 288-92.  Plaintiff reported that the primary reason she cannot work was pain in her lower and upper back that radiated to her hips, shoulders, and elbows.  R. 291.  Dr. Adhami's examination revealed no paravertebral muscle spasm; a negative straight leg-raising test; normal sensation and deep tendon reflexes; 5/5 muscle strength throughout; no muscle atrophy; normal joints; and moderate scoliosis with decreased range of motion in flexion and extension.  R. 288. He diagnosed moderate scoliosis and a history of multiple mental problems and a personality disorder.  R. 292.

In May 2009, Plaintiff presented to her primary care physician for family planning counseling. R. 345. She also reported increased depression and not wanting or forgetting to take showers. *Id.* The practitioner referred Plaintiff to Putnam Behavioral for an intake assessment. *Id.*

Plaintiff returned to her family physician at the PCHD in March of 2010 and reported that her back pain was controlled with Flexeril and an occasional Lortab tablet. R. 317. During an August 2010 appointment, Plaintiff admitted to using marijuana two weeks earlier. R. 390. The clinician admonished Plaintiff to stop using marijuana and prescribed Lortab (a pain reliever) and Robaxin (a muscle relaxant). *Id.*

In November 2010, Robert Steele, M.D., a state agency physician, reviewed the evidence of record and found that Plaintiff did not have a "severe" physical impairment. R. 324. The ALJ accorded "little weight" to Dr. Steele's opinion and gave Plaintiff the benefit of the doubt in light of minimal records regarding her alleged physical impairment. R. 29.

## 2. Mental Impairments

In March of 2008, Plaintiff presented to Family Medical and Dental Centers for an initial psychological screening. R. 381-82. Although Plaintiff's mood was anxious and her insight and judgment appeared to be poor, her appearance and grooming were appropriate, motor activity was relaxed, she was cooperative, her speech was normal, her affect was broad, IQ appeared average, and her memory was normal. R. 381. It appears that she only kept one appointment after her initial screening assessment. The progress note is largely illegible. R. 385-86.

Upon referral from her primary care physician, R. 345, Plaintiff presented to Putnam Behavioral in May of 2009 for an initial psychiatric evaluation and medication management. R. 371-75. Michael Speisman, ARNP, noted that Plaintiff's mood was depressed and her affect sad, but her thought process was coherent, organized, linear, and goal-directed; she denied any perceptual disturbances; she had no hallucinations, suicidal ideations, or paranoia; she had a compulsion to play video games; her cognitive functioning was grossly intact; there was no overt thought disorder; she had no looseness of associations or flight of ideas; her insight was fair to poor; and her judgment was fair. R. 373-74. She could care for her personal needs and perform housework. R. 374. Mr. Speisman assigned an estimated Global Assessment of Functioning (GAF) score of 50 and recommended individual therapy and Cymbalta (an anti-depressant). [2] R. 375.

---

[2] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *See* DSM-IV-TR at 34. A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be

During monthly medication checks after her initial assessment, Plaintiff's medications were adjusted and, as a result, her mood improved. R. 361, 363, 365, 367, 369. Her GAF score rose from an estimated initial score of 50, a GAF score of 55 in August 2009, R. 364, to a score of 60 by September of 2009. R. 362. Although she reported "? Hypomania" in October of 2009, she had a good response to Zyprexa (a bipolar medication) that made her feel "a lot better" by November of 2009 and her GAF score was 60. R. 354, 357-60. Plaintiff's next review was scheduled for May 12, 2010. R. 354. The May 12, 2010, notes from Mr. Speisman are included in Exhibit 15F, R. 415-16, although earlier visits in 2010 are noted below.

On February 3, 2010, Mr. Speisman noted during a medication management meeting visit that Plaintiff was started on Celexa one month ago. Plaintiff's response was good, she was more stable, sleep was fair, and appetite good. No medication side effects are reported. R. 322. Plaintiff's GAF score remained at 60, although her prognosis was guarded. Her mental examination was mostly normal. R. 323. There are similar findings on March 17, 2010. R. 320-21. On April 13, 2010, Plaintiff reported being forgetful, depressed mood, upset, angry at times, and "totally flipped out." R. 318. Response to medication was fair. Her GAF score remained at 60, with a guarded prognosis. R. 319. Plaintiff was referred to PCP for evaluation of migraine headaches. A recent CT scan in the ER was negative. *Id.*[3]

---

dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

[3] This is the last patient note from Mr. Speisman in the record until Exhibit 15F was added, which includes patient notes from May 12, 2010, to November 30, 2010. *See infra* at 19-20. R. 400-16.

On April 15, 2009, Gayle Frommelt, Ph.D., completed a Psychiatric Review Technique (PRT). R. 274-87; *see* R. 272-73 (request for medical advice). Dr. Frommelt noted there was insufficient evidence to rate Plaintiff's functional limitations. R. 284. Dr. Frommelt's consultant notes indicate she was familiar with Plaintiff's prior arrests, criminal background of the father of her child, and Plaintiff's reported abuse as a child. R. 286. Dr. Frommelt reported a lack of contact by Plaintiff. R. 286; *see* R. 59 (Disability Determination and Transmittal form mentioning Dr. Frommelt's April 15, 2009, PRT).

In November of 2009, the state agency arranged for a consultative psychological evaluation with Janet K. Humphreys, Ph.D. R. 30-31, 294-97. Among other symptoms, Plaintiff reported anxiety, irritability, feelings of guilt, poor concentration, and sleep difficulties, and a history of sexual and physical abuse during her teens. R. 294-95. She also indicated that she was being treated with medications. *Id.* Although she had to be reminded to bathe, she could care for her own personal needs. R. 295. Her grandmother did the cooking and housekeeping and Plaintiff spent a typical day caring for her animals, reading, watching movies, and playing video games. *Id.* She also went to the flea market with her boyfriend on weekends and helped him with his booth. *Id.*

Dr. Humphreys' mental status examination revealed that Plaintiff was cooperative and talkative, speaking at a rapid rate; her mood was anxious and her affect was expressive; her thought processes were tangential; she had no peculiar or bizarre thought content; her judgment and insight were good; her remote memory appeared intact; her fund of information was adequate; and she could perform simple multiplication. R. 296. Dr. Humphreys diagnosed bipolar disorder; PTSD; anxiety

disorder, and a pain disorder. *Id.* Regarding Plaintiff's ability to perform work-related

activities, Dr. Humphreys felt that Plaintiff's concentration and memory appeared mildly

impaired, which could affect her ability to carry out complex instructions. R. 297. She

also felt that Plaintiff's social skills and judgment could be affected by her mood and

anxiety. *Id.* The ALJ accorded "significant weight to Dr. Humphreys['] diagnoses and

opinion because she is an examining medical source, whose findings are supported by

her objective testing and consistent with other evidence of record (Exhibits 7F, 8F, 10F,

12F, 13F)." R. 30. The ALJ also found Dr. Humphreys' opinion supported the RFC

determination. *Id.*

On December 8, 2009, Thomas Conger, Ph.D., assessed Plaintiff's mental RFC

and found that although Plaintiff's condition could result in some concentration

problems, she was capable of performing routine tasks on a sustained basis if

motivated. R. 31, 300-01. Further, although Dr. Conger felt that Plaintiff's condition

could result in some social difficulties, she could relate effectively in general. *Id.*

Dr. Conger opined that Plaintiff had adequate understanding and adaptation abilities.

*Id.* Dr. Conger also completed a PRT and determined that Plaintiff had mild restrictions

of activities of daily living, moderate difficulties in social functioning and in maintaining

concentration, persistence, or pace, and no episodes of decompensation, each of

extended duration. R. 313; *see* R. 315 (consultant's notes).[4] The ALJ accorded

---

[4] Dr. Conger noted:

The claimant is limited by her physical condition and pain to some extent but she
acknowledges the mental ability to perform routine ADLs within her physical
restrictions, when motivated. She is not alleging a worsening in her mental
condition since the initial denial. She has a history of treatment for depression
and anxiety symptoms, with positive results, and the most recent treatment
records reflect an overall adequate Mental Status. She has a history of

"significant weight to Dr. Conger's assessment and opinions because he is an acceptable medical source, whose findings are consistent with the opinion of Dr. Humphreys above (Exhibit 6F), and support the [RFC] delineated above."  R. 31.

### 3. Plaintiff's Statements and Hearing Testimony

In a Function Report, Plaintiff indicated that a typical day involves caring for her numerous pets, eating breakfast, then playing a computer game "all day pretty much." R. 201-02.  Her hobbies and interests included playing with her animals, writing and drawing, playing video games, and fishing.  R. 205.  She spoke with her boyfriend twice a day on the telephone and spent her weekends with him.  *Id.*

Plaintiff had no past relevant work.  R. 28, 45.  She testified that she had several work attempts since 2008 such as working at McDonald's where she was hired to do "[f]ries and cashier."  She lasted less than two weeks because she "wasn't competent enough to keep up with their pace," because she could not stand on her feet for more than a couple of hours of time and had to take continuous breaks during an eight-hour shift.  R. 46.  She could not handle the stress mentally (she got confused very easily-- she could not remember the orders and made mistakes giving change) and she could not stand for a lengthy period of time--she was in pain (back problems--scoliosis). R. 46-47.  She could stand for only one to two hours and then start hurting in her back and hip.  R. 47.

interpersonal difficulties but also shows the ability to relate effectively in general. Although she may experience some depression and/or anxiety at times, she remains functional from a mental perspective.  Based on the totality of evidence, she appears to be primarily limited by her physical condition and there is no indication of a mental impairment that would meet or equal any listing at this time.

His diagnoses were: depressive disorder, NOS; anxiety disorder, NOS; and rule out PTSD.  R. 315.

She did not try to work "right away" after working at McDonald's. R. 48. As for her mental health, she said she "was trying to commit suicide." During this time, her mother helped her and she was not receiving mental health treatment. *Id.* In 2010, she started working at a veterinary clinic as a kennel assistant to help wash, clean, feed, and water the dogs and to take their weight. *Id.* She worked for approximately two months when she got in a scooter accident as a result of having a panic attack while driving. *Id.* She started to panic, got on her scooter and drove to the bank, and believes she had a panic attack, and only remembers "waking up in an ambulance" and nothing more. R. 49. She was let go from her employment at the clinic because she could not stand for long periods. They had been cutting back her hours and told her they would be hiring a replacement. They gave her a paycheck. R. 49.

Plaintiff stated that she had been treated at Family Medical and Dental since 2003 or 2004 and received mental health treatment. R. 49-50. She was unable to "cope with the real world," "scared to face it," and wanted to stay in "her room all the time and in [her] house and not come out." R. 50. This happens "[f]ive days out of the week." *Id.* She plays video games or is on the computer. *Id.* When she ventures outdoors, nobody likes her. *Id.*

Plaintiff further testified that she started treatment at Meridian Behavioral in 2010. R. 50-51; *see* R. 28. She was referred by the Stark Health Department. *Id.* She could not sleep or eat and was depressed "all the time, got suicidal sometimes, other times [she] flipped out and tried to hurt people or animals." R. 51. She is currently taking Trazodone for sleep problems; Celexa for general bipolar; Clonazepam for anxiety; and a new medicine for depression. *Id.* Since May of 2008,

She states her symptoms include crying, lack of appetite and energy, and she does not want to talk with people. *Id.*

Plaintiff's ex-boyfriend drove her to the hearing. R. 52. She is supported by her mother and grandmother. *Id.* She and her boyfriend had been broken up two before the hearing. She had helped him at the flea market for four hours one day on the weekends, but only when he went to the bathroom. She made "lots of mistakes." R. 51-52. She mostly sat and did not help him set up. R. 53.

Plaintiff no longer has most of her animals, except for a dog and some chickens, as she cannot afford them. *Id.* She occasionally fishes. *Id.* At one time, she considered creating her own card games, but "grew bored with the idea." She had the same experience with writing stories. She cannot stay focused. *Id.* This occurs every day. She has bad memories, five to six times a day. R. 54. She can walk one to two miles. R. 54.

After Plaintiff testified, the ALJ asked the vocational expert to assume an individual who could sit up to eight hours per day; stand or walk up to four hours per day but not more than one hour at a time; lift up to 20 pounds occasionally and ten pounds frequently; occasionally climb stairs, bend, stoop, and reach overhead; never crawl, crouch, kneel, or climb ladders, ropes, or scaffolding; and never work around unprotected heights, work around moving and hazardous machinery, drive motorized vehicles, or use foot controls. R. 55-56. The ALJ asked the vocational expert to further assume that the individual required simple, unskilled, repetitive work with low to moderate stress, done primarily alone and without substantial interaction with other people. R. 56. The vocational expert testified that an individual with Plaintiff's

vocational profile and RFC could perform work such as an office helper, and addresser, and a document scanner, with all jobs having an SVP of 2 and unskilled.  *Id.*

### 4.  Medical Evidence Received After the Hearing

As noted above, at the outset of the hearing on May 11, 2011, Plaintiff's counsel advised the ALJ that she had reviewed the file and had no objections to the admission of Exhibits 1A through 14F.  R. 40.  It appears that counsel advised the ALJ, off the record, that there were some outstanding records from Meridian Behavioral.  The ALJ stated that he would "leave the record open for 20 days, and if [counsel] need[ed] any additional time," to "let us know."  *Id.*  The following additional colloquy transpired:

> ATTY: Thank you, Your Honor.  Your Honor, in addition to possible additional records needed, of course, the claimant was sent out for a consultative mental health exam; however, it did not include – let me get to the – by Dr. Humphrey's [sic], Your Honor, it did not include a mental residual functional capacity.  Clearly, Dr. Humphrey's [sic] has noted significant mental health issues including bipolar disorder; manic, severe without psychotic features; PTSD; and as I stated earlier, Your Honor, these – the diagnoses as well as the severity of the claimant's mental health issues are consistent with the prior evidence, the prior medical evidence.  This was a cessation case not due to any medical improvement but simply that the, the client wasn't able to provide any evidence and wasn't present at the hearing.

> ALJ: Um-hum.  I might suggest that when you request these records from Meridian you also send them a mental RFC form either what we customarily use or another appropriate form.

> ATTY:  Yes, sir.

> ALJ: Then if you think it's warranted when those records are sent to us, if you still think you might want a form of that type filled out by Ms. Humphrey's, you could request that.

> ATTY: Thank you, Your Honor.

R. 40-41.

The record indicates that on July 19, 2011, over two months after the hearing, and with no additional time requested by Plaintiff's counsel appearing in the record, Plaintiff's counsel faxed additional records from Putnam Behavioral, not Meridian Behavioral, to "Jax" (to the hearing office according to the Commissioner) dated May of 2010 through November of 2010, R. 400 (fax cover sheet). R. 401-16 (Exhibit 15F records). Also on July 19, 2011, Plaintiff's counsel faxed records from the Putnam County Health Department to "Jax" (to the hearing office according to the Commissioner) dated May 6, 2009, to January 10, 2011, R. 417 (fax cover sheet). R. 418-76 (Exhibit 16F records). Exhibits 15F and 16F do not include records from Meridian Behavioral. The record also reflects that Exhibits 15F and 16F are not included in the ALJ's list of exhibits that follow his written decision. R. 34-37.

The records from the PCHD, Exhibit 16F, reveal, in part, the following. In May of 2009, Plaintiff requested counseling to deal with alleged past sexual assaults and losing custody of her two children. R. 426-27, 476. Plaintiff was provided with crisis intervention services. R. 475.

On May 15, 2009, a "VIPP Therapy Follow-Up" sheet indicates that Plaintiff's mood was normal, affect was appropriate, thought process and content was normal, no disorders of perception present, oriented x4, and motor activity was relaxed.[5] R. 473.

---

[5] Many of these patient notes included in Exhibit 16F are difficult to read, although the provider of services is stated. It appears that Joanne O'Neil, LCSW, HSPM, Human Resources Program Manager, Violence Intervention and Prevention Program, R. 434, provided counseling on May 15, 2009, and on subsequent dates. *See, e.g.*, R. 418-20, 424-25, 428-33, 436-39, 442-43, 447-50, 453, 464-74. On other occasions, Advocate Margaret Betancourt, HSC1, provided services. *See, e.g.*, R. 419-23, 425, 428-29, 435, 440-41, 446, 445, 449, 452-57. Another advocate provided services in January and February 2010. R. 436, 442 ("Jeannette [  ]"). In her memorandum and when discussing "medical records," doc. 23 at 20, Plaintiff refers to

Plaintiff thought she was pregnant and those issues were discussed.  *Id.*  As of June 16,

2009, Plaintiff advised that she was not pregnant.  Normal tone and content were

recorded.  R. 471.  A July 22, 2009, note indicates similar client behavior as on May 15,

2009.  R. 461.  Plaintiff stated she was having a difficult time living and her current living

situation was discussed.  *Id.*  Similar client behavior is noted on August 8, 2009.

R. 469.  Her medical needs are discussed including dental services.  Plaintiff reported

using pet therapy to calm herself when angry.  *Id.*  As of August 13, 2009, the

counselor's diagnoses include depression, bipolar disorder, PTSD; borderline

personality trait; housing problems; and a GAF score of 50.  R. 466.  (In September of

2009, Mr. Speisman from Putnam Behavioral assigned Plaintiff a GAF score of 60.

R. 362.)  On September 22, 2009, Plaintiff's client behavior was similar (cooperative,

normal mood and affect oriented x4, relaxed motor activity, and normal thought

content).  Plaintiff described ongoing dental problems and mental health issues were

discussed.  R. 456, 464; *see* R. 457 (Plaintiff "seemed happy today").  Plaintiff

described her "increases in anxiety symptoms" with flashbacks.  *Id.*  Plaintiff displayed

improved insight and ability to take responsibility in relationships.  *Id.*  Counseling

sessions continued throughout 2009, *see, e.g.*, R. 445-49.  On November 12, 2009,

Plaintiff reported "feeling better."  R. 447.

On January 6, 2010, Plaintiff's behavior, mood, affect, and thought content were

normal.  Her thought process was circumstantial.  She was restless, but oriented x4.

Plaintiff complained of having memory problems, irritability, mood swings, and being

---

one treatment note from Ms. O'Neil of August 13, 2009, when Plaintiff received a GAF
score of 50.  R. 466.

jittery. She reported being out of Trazodone for five days and Pristig (sp) for four days. R. 443. Therapy sessions continued in January through January 2011. R. 418-49.

During two August of 2009 appointments with PCHD, Plaintiff stated that she had been working with her boyfriend at the flea market and weekends and was earning some money. R. 457, 469. Most of the advocates notes reflect assistance being provided to Plaintiff in the form of free or donated clothing, hygiene products, food, and prescription; assistance arranging for low-cost or free demo work; assistance with legal proceedings surrounding termination of her parental rights, and shoplifting charge, and a charge for driving without a license; and coping skills to avoid arguments in the home. R. 419-56. During a June 2010 appointment, Plaintiff shared her "good news of having a job as a vet assistant." R. 423. During a November 2010 appointment, Plaintiff stated that she was working at a jewelry shop with friends on the weekend. R. 419.

The records from Putnam Behavioral, Exhibit 15F, from May 12, 2010, through November 30, 2010, reveal, in part, the following.[6] During her May 2010 medication check with Mr. Speisman, Plaintiff reported good medication compliance, a better ability to cope with stress, and mood improvement. R. 415. Mr. Speisman once again noted that Plaintiff had a good response to her medications. *Id*. The following month, Plaintiff reported some anxiety and that she "may be starting a job soon." R. 413. Plaintiff's GAF score remained at 60; her prognosis was guarded. R. 414. (On April 13, 2010, Plaintiff's GAF score was 60. R. 319. This April patient note is the last note in the record from Mr. Speisman until Exhibits 15F and 16F were filed.) Mr. Speisman increased Plaintiff's Trazodone dose and no side effects were noted. *Id*. When Plaintiff

---

[6] In her memorandum and when discussing "medical records," doc. 23 at 22-23, Plaintiff refers to Mr. Speisman's assigned GAF scores of 60 and diagnoses of guarded and one diagnosis of PTSD, from May through November of 2010, R. 404-16.

returned for a medication check in October 2010, she reported that her medications were effective. R. 407. (Her GAF scores in July, August, October, and November of 2010 were 60. R. 406, 408, 410, 412.)

**B. The ALJ and the Appeals Council did not err when denying Plaintiff's application for Social Security benefits.**

1.

Plaintiff argues the ALJ erred because he did not evaluate evidence, Exhibits 15F and 16F, that Plaintiff's counsel provided *to the ALJ* after the hearing was conducted by the ALJ, but before the ALJ entered his decision. Doc. 23 at 25-27. The Commissioner states that these exhibits were faxed to the "hearing office." Doc. 24 at 7-8. The Commissioner further argues that "it is not clear from the record that the ALJ even saw this evidence. While the evidence reached the hearing office before the ALJ issued his decision, the decision could have already been drafted by a decision writer and simply awaiting the ALJ's signature. In any event, as noted above, even if the ALJ saw the evidence, he was not required to discuss it." Doc. 24 at 13.[7] The Commissioner also noted "that Plaintiff cites several cases for the proposition that the ALJ must consider and evaluate every medical opinion he receives. While she is correct on that legal point, the additional evidence in Exhibits 15F and 16F does not contain a medical opinion." Doc. 24 at 14 n.7.

Exhibits 15F and 16F are included in the record that was considered by the Appeals Council and the record before the Court. There is no indication in the record, however, that Exhibits 15F and 16F were presented to the ALJ for consideration. These exhibits were not submitted to the ALJ within the 20-day deadline established by the

---

[7] The record indicates that Exhibits 15F and 16F were faxed by Plaintiff's counsel on July 19, 2011, to "Jax" under two separate fax transmissions. R. 400, 417.

ALJ at the hearing nor does the record indicate that Plaintiff's counsel requested an extension of time to submit additional evidence, an opportunity afforded by the ALJ. R. 40.

The focus of Plaintiff's argument is that the ALJ and the Appeals Council erred because they did not consider the opinions of treating physicians or other medical opinions presumably in Exhibits 15F and 16F. Doc. 23 and 25-27. In her memorandum, Plaintiff does not refer to any treating physician opinions in Exhibits 15F and 16F. Exhibit 15F includes notes from Mr. Speisman, an advanced registered nurse practitioner. Exhibit 16F includes notes from Advocate Betancourt, HSC1, and another advocate, and Ms. O'Neil, LCSW, HSPM. *See supra* nn. 5 and 6.

Ms. Speisman and Ms. O'Neil are not, however, "acceptable medical sources" such as a licensed physician or licensed or certified psychologist. 20 C.F.R. § 416.913(a)(1)-(2). Rather, nurse-practitioners and licensed clinical social workers, like Mr. Speisman and Ms. O' Neil, respectively, are considered "other sources." 20 C.F.R. § 416.913(d)(1). Pursuant to Social Security Ruling (SSR) 06-03p, 2006 SSR LEXIS 5, at *3 (Aug. 9, 2006) (citing 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)), only "acceptable medical sources can give . . . medical opinions."[8] "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.

---

[8] The opinions of a nurse practitioner and licensed clinical social worker are not entitled to the same weight as afforded the opinion of a treating psychiatrist or psychologist. Osterhoudt v. Astrue, Case No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011) (ARNP); Marin v. Astrue, Case No. CV 11-09331, 2012 U.S. Dist. LEXIS 157093, at *10 (C.D. Cal. Oct. 31, 2012) (LCSW); SSR 06-03p, 2006 SSR LEXIS 5, at *3-4 (2006). The opinions of these providers, however, may be considered "to show the severity [but not the existence] of [the claimant's] impairments(s) and how it affects [their] ability to work." 20 C.F.R. § 416.913(d); SSR 06-03p, 2006 SSR LEXIS 5, at *5.

Instead, there must be evidence from an 'acceptable medical source' for this purpose."

SSR 06-03p, 2006 SSR LEXIS 5, at *5.  Plaintiff does not argue how this additional

evidence would have changed the administrative outcome, either before the ALJ or the

Appeals Council.  *See infra* n.11.

Nevertheless, the regulations provide that a claimant is required to submit written

evidence to the ALJ "no later than five business days before the date of the scheduled

hearing" and if compliance is lacking, the ALJ "may decline to consider the evidence

unless the circumstances described in paragraphs (b) or (c) of" 20 C.F.R. § 405.331

apply.  20 C.F.R. § 405.331(a).  Paragraph (b) does not apply here.  Paragraph (c)

states:

> (c) If you miss the deadline described in paragraph (a) of this section and you
> wish to submit evidence after the hearing and before the hearing decision is
> issued, the administrative law judge will accept the evidence if you show that
> there is a reasonable possibility that the evidence, alone or when considered with
> the other evidence of record, would affect the outcome of your claim, *and*:
>
> (1) Our action misled you;
>
> (2) You had a physical, mental, educational, or linguistic limitation(s) that
> prevented you from submitting the evidence earlier; or
>
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your
> control prevented you from submitting the evidence earlier.

20 C.F.R. § 405.331(c) (emphasis added).  At the administrative hearing, the ALJ gave

Plaintiff's counsel 20 days to submit additional evidence and further advised that

Plaintiff's counsel could request additional time.  R. 40.  Counsel does not explain in her

memorandum why the exhibits were provided late nor does the record indicate why they

were filed late.  There is no cover letter in the record requesting an extension of time or

requesting the ALJ to review these exhibits.  *See, e.g.*, R. 400, 417 (fax cover sheets).[9]

In addition to 20 C.F.R. § 405.331 cited above, the HALLEX I-2-6-78, 1993 WL 751904

(Sept. 2, 2005), which is a section of the Hearings, Appeals and Litigation Manual of the

Office of Disability Adjudication and Review, Social Security Administration, states in

part:

> Before closing the hearing, the ALJ must ask the claimant and the representative if they have any additional evidence to submit.
>
> 1. If the claimant and the representative have no additional evidence to submit, and the ALJ determines that no additional evidence is needed, the ALJ should state on the record that the hearing and record are closed, and inform the claimant and the representative that a written decision setting forth the findings of fact and the conclusions of law will be issued.
>
> 2. If the claimant and the representative have additional evidence to submit, or the ALJ determines that additional evidence is needed (e.g., a CE or an updated medical report), the ALJ will inform the claimant and the representative that the record will remain open after the hearing to allow them time to submit the additional evidence, or until the ALJ can obtain the additional evidence that is needed.

HALLEX I-2-6-78, 1993 WL 751904 (Sept. 2, 2005).[10]  The closing of the record is

important because "at some point in time, there must be a definite record upon which

the [ALJ] can make a decision."  Alper v. Shalala, Civil Action No. 94-5972, 1995 U.S.

---

[9]  The situation may have been different if the record indicated that counsel had requested additional time or shown some legitimate reason why the evidence was not timely submitted.  *See generally* Neeson v. Colvin, Case No. 2:12-CV-51-SNLJ-SPM, 2013 U.S. Dist. LEXIS 141806, at *33-35 (E.D. Mo. July 23, 2013).

[10]  HALLEX I-2-7-20, 1993 WL 751909 (Sept. 2, 2005) ("When a claimant or representative requests time to submit evidence or written arguments after the hearing, the ALJ must set a time limit for the posthearing actions to be completed and inform them that if the material is not received within the time limit, absent a showing of good cause to extend the time, the ALJ will issue a decision without the material.  The HO staff should diary the case for the time set by the ALJ.  1.  If the material or a showing of good cause is not received by that time, the ALJ will issue a decision without the material.  Further contact with the claimant or representative is not necessary.")

Dist. LEXIS 4030, at *4 (E.D. Pa. Mar. 28, 1995) (*citing* <u>Brown v. Schweiker</u>, 557 F. Supp. 190, 193-94 (M.D. Fla. 1983)). Plaintiff did not request additional time (beyond the time afforded by the ALJ at the hearing) to furnish the ALJ with Exhibits 15F and 16F, and, as a result, the record closed on Tuesday, May 31, 2011. *See* <u>Ostigny v. Comm'r of Soc. Sec.</u>, Case No. 12-477-SJH-JGW, 2013 U.S. Dist. LEXIS 123844, at *7-8 (S.D. Ohio Aug. 29, 2013).

Based on the foregoing, the Court concludes that the record does not indicate that the ALJ had Exhibits 15F and 16F before him when he entered his decision. Because the Plaintiff did not sustain her burden of establishing that Exhibits 15F and 16F were part of the record before the ALJ, the Court finds no error in the ALJ's failure to consider them. *See* <u>Taylor v. Colvin</u>, Case No. 12-4130-JWL, 2013 U.S. Dist. LEXIS 169438, at *7-10 (D. Kan. Dec. 2, 2013).

2.

Plaintiff also argues that the ALJ and the Appeals Council erred when they did not request a medical advisor to review Exhibits 15F and 16F, claiming that such evidence was significant, new and material evidence, which was added to the record after the evidence was last reviewed by a medical consultant. Doc. 23 at 28-29.[11] As noted above, the Commissioner responds that the ALJ was not required to discuss the evidence Plaintiff submitted after the record was closed. Doc. 24 at 12-14. The Commissioner also argued that the ALJ had no duty to order an additional medical

---

[11] Plaintiff does not expressly argue that the Appeals Council erred, and therefore this case should be remanded, because "there is a reasonable possibility that the new evidence would change the administrative outcome." <u>Hyde v. Bowen</u>, 823 F.2d 456, 459 (11th Cir. 1987).

consultant review and obtain a medical opinion after Plaintiff submitted Exhibits 15F and 16F. Doc. 24 at 14-16.

Plaintiff relies exclusively on SSR 96-6p, 1996 SSR LEXIS 3 (July 2, 1996), for the proposition that the ALJ and the Appeals Council erred because they did not request an updated medical expert opinion to review Exhibits 15F and 16F. SSR 96-6p provides in part that "[a]n updated medical expert opinion must be obtained by the [ALJ] or the Appeals Council before a decision of disability based on medical equivalence can be made." SSR 96-6p, 1996 SSR LEXIS 3, at *2 (July 2, 1996). No case law is cited to support Plaintiff's argument.

It is initially observed that on December 8, 2009, Dr. Conger reviewed the evidence of record and completed a PRT in which he found that Plaintiff's impairments did not meet or equal a listed impairment. R. 313. In addition, Dr. Conger signed the Form SSA-831-C3, Disability Determination and Transmittal Form, in which he concluded that Plaintiff did not meet or equal a listed impairment. R. 60. As a result, the requirement of SSR 96-6p, that the record contain a medical opinion on equivalence, was satisfied. *See* SSR 96-6p, 1996 SSR LEXIS 3, at *8 (July 2, 1996).

Further, SSR 96-6p requires the agency to obtain an updated medical opinion when, and relevant here, additional evidence is received that, in the opinion of the ALJ or Appeals Council, "may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* at *9-10. Here, the additional evidence was received and considered by the Appeals Council, but the Appeals Council concluded that Exhibits 15F and 16F would not have changed the ALJ's decision.

R. 1-5; *see supra* n.11.  Further, Plaintiff does not persuasively argue why the additional evidence would have proven that Plaintiff's impairment(s) would have met or equaled any of the listed impairments.

## V.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence in the record and he correctly applied the law. Accordingly, the decision of the Commissioner to deny Plaintiff's application for SSI is **AFFIRMED.**  The Clerk is directed to enter **JUDGMENT** for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on January 2, 2014.

<u>s/  Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**